Good morning, may it please the Court, Ken Lund on behalf of Appellant Salvador Gugino. Also joining me is Dan McNutt, Counsel for Ann Pantelis and Infinity. He's going to take one minute of Appellant's time. I would also like to reserve two minutes for rebuttal. The District Court got it exactly right when it granted Judge Israel's motion to dismiss on the basis of immunity, but the District Court was dead wrong when it denied that same immunity to Gugino. All Gugino did was comply with Judge Israel's request to prepare the draft written order, the order that Judge Israel came up with all by himself. Gugino did not request it. He did not recommend it. The only, if Judge Israel had done the acts that Gugino is alleged to have committed in this case, whether true or untrue, there's no question that Judge Israel would enjoy absolute immunity. The only difference in this case is Judge Israel delegated that core judicial function to counsel. And the only reason that Gugino is here is because he complied with that request. But, counsel, what is the strongest case authority you have to support your argument that an attorney who prepares an order that violates the bankruptcy stay is entitled to immunity if the order is done at the request of a judge? What's your strongest case authority? The beautiful thing, Your Honor, is the whole line of Ninth Circuit cases and Supreme Court cases all go towards that. But if I had to pick a strongest one, the Moore case out of the Ninth Circuit, where the court held that a law clerk enjoys quasi-judicial immunity. Well, that's a little different than an attorney. An elbow law clerk is an extension of the judge, not in the same way that an attorney who is practicing before the judge. It's a different relationship. So that's your strongest case, that your client should be treated in a similar fashion as an elbow law clerk? Another case, Your Honor, any of the Ninth Circuit cases, including as recently as Castillo, all hold that you look at the function performed, not the actor performing it. And in this case, we're looking at the act. If a judge prepares an order, that's a core judicial function. I don't think anybody can question that. As far as the voluntariness issue, there is a total absence of any case authority that if an actor volunteers at the request of a judge to prepare the order, that the fact that the actor wasn't compelled to do so defeats immunity. There's nothing that says that. In fact, many of the cases, including the cases where court clerks and bankruptcy quasi-judicial actors who perform judicial functions voluntarily of their own volition. All of those people are affiliated with the court. That's the difficulty I'm having with your argument, is all of the examples you have given us are people who are extensions of the court, who are appointed by the court, who are employed by the court. And I'm looking for a case that gives immunity to someone who is not part of the court family. So to speak, is not employed by the court, is not appointed by the court. Do you have anything of that nature? The closest equivalent would be, I think, a bankruptcy trustee. Granted, they are to some extent an extension of the court, but there is some independence there. That's what makes this issue interesting, is we really don't have any case law about attorneys filling these judicial roles. But what needs to be emphasized is that in all of these cases, the point is clear. It doesn't matter who the actor is and who's performing the function. It doesn't matter whether they are an employee of the government or an employee of the court system. The cases in the Supreme Court and the Ninth Circuit say you look at the judicial function. Now, there are cases I cite in my brief where it says that attorneys aren't officers of the courts. In fact, the other one is that the court is not a judicial institution. Now, there are cases I cite in my brief where it says that attorneys aren't officers  In fact, the other one is that the court is not a judicial institution. And you are asking us to extend, stretch a little bit beyond any case that's out there. Isn't that true? I don't think so, Your Honor. You want us to apply a principle in a situation where there's been no ruling of any court that says an attorney can be an arm of the court for quasi-judicial immunity, right? But there have been rulings. Prosecutors enjoy immunity, but more to the point. But that's prosecutorial immunity. That's a slightly different function. It's limited. It's not absolute immunity. It's limited when they are performing prosecutorial functions. I'd agree with that. But I think the concern of the district court in this case was the fact that there's an affirmative duty on nonparties in a bankruptcy to help enforce the automatic stay. And I think reading between the lines of the decision, what I think the judge thought should have happened is that what should have happened is the attorneys in the courtroom at that time should have said you can't do that. Understood. And certainly if they'd filed a brief, if they'd filed a motion, if they'd taken any affirmative action beyond that, that would have violated the stay. So it's a peculiar question of drafting an order at the request of a judge, I grant you. But I think that was the one of the issues that concerned the bankruptcy. The question is not the actor. The question is the function. Preparing an order is a court judicial function. And if there isn't law, there needs to be. Because in a perfect world, the judge would prepare these orders himself. But with crowded State dockets, the judges have largely delegated this responsibility to attorneys. But attorneys do, I mean, attorneys do have the opportunity to tell the judge, you know, why it would be, it wouldn't be in the position, why the attorney would not be in the position to prepare the order. And Sternberg v. Johnston, our 2010 case, seems to require an attorney to at least inform the judge if direction is given that's contrary to the stay, to alert the judge as to why it would not be possible to perform that test. So why shouldn't we impose that requirement in this case? Your Honor, I see my time is up. Can I answer that? Your time is not up. Quickly, because the judge, the judge Gugino, Gugino didn't ask for this. He's put in a tough position when a judge asks you to prepare an order. Granted. If Gugino had asked for this, it would be a different flavor. But Gugino never sought any of this. But he's an experienced attorney who is not a shrinking violet and would be able to inform the court that there may be a problem with preparing the order. Attorneys have to do that all the time. So I'm not sure that I agree that Mr. Gugino was at the mercy of the court and did not have an opportunity to inform the court that the State order trumped the proposed order that was being requested. I think it puts attorneys in a tough position, Your Honor, to a judge they appear before regularly to have to make that decision on the fly whether they need to comply with the judge's request or not. I just have one question. I want you to respond quickly to, on page 12 of the district court's order, it said Gugino had at a minimum an affirmative duty to alert the State appellate court to the conflicts between the order and the automatic stay, citing the Sternberg case that Judge Rollinson just said. What's your response to that? It's totally not applicable. The facts of Sternberg, in that case, the attorney was pursuing vigorously the enforcement of the order. He was before the appellate court. In this case, Gugino, I guess he's supposed to prepare a writ before the appellate court. It makes no sense, Your Honor. Thank you. I'll reserve 30 seconds for rebuttal. Good morning. Dan McNutt on behalf of Appellants Infinity Capital and Ann Pantelis. May it please the Court. Judge Rollinson, if I may tag on to the end of your question. Oliver Wendell Holmes said that cool and detached reflection is not the standard in the face of an upraised knife. So when you're standing in court, as everybody on this panel would know, and the judge has it in his mind to tell you to do something, cool and detached reflection may or may not be the standard. The problem with your argument is that he did not prepare the order on the spot. He went back to his office, had time to reflect before the order was prepared. And that goes to the second part of my answer, Judge. It was obviated, because Judge Israel then changed his ruling and his directive to Mr. Gugino, my client's lawyer. He changed that and said, we're not going to have an order to show cause. We're going to just simply set a status check. So I believe under your analysis, and I think Sternberg is the genesis of your question, under that analysis, it was obviated because the judge himself, in effect, reversed his decision. So the order to show cause, and Sternberg does say within a reasonable time. And so maybe in the court's mind it's a little shorter by the time he got back to his office, but a reasonable time with, as my colleague said, Mr. Gugino, who practices in state court all the time, when a court gives you a very specific directive, Judge Israel was a litigator involved in the Michel case underlying. He had a very specific bend on that case when he gave his directive. I think it was fair, and the transcript is pretty clear, that some questions were raised in front of the judge at the hearing. And as we all know, you advocate to the best of your client's ability, but you cannot press a judge. I cannot impose my will upon him. And I think Mr. Gugino struck the right tone and then went back to his office. Maybe he did draft it, but it was ultimately unsigned, which goes to the ultimate act analysis under the Ashelman case and its progeny, which further answers, I think, Judge Gilman's question earlier in terms of additional cases. So I know that we're barreling down on the time, and I only said I was going to take one minute, but I wanted to answer that question from my client's perspective. In fact, from my client's perspective, we almost think, why are we here? Certainly my clients neither asked for an order to show cause. That was no part of their request for relief pre- or post-petition of the bankruptcy. And it certainly was not a benefit to my client. In fact, in the record, volume 2, page 145, there's a letter from the plaintiff in the case, Mr. Jan Paul Cook. And it closes with this directive to Judge Israel. We can do this the easy way or the hard way. It matters not to me. Well, sir, two and a half years later, we're obviously doing it the hard way. Well, part of the problem is, it seems to me, terrible miscommunication between the two lawyers. I mean, I note that on June 10, 2011, Cook sent Gugino a copy of the complaint and said, why don't you dismiss the interpreter and get your funds from the bankruptcy trustee? Otherwise, what do you suggest? I'll hold up and won't send copies to Judge Israel pending your reply. I don't think the record shows your client ever replied. Well, Your Honor, I'll let Mr. Lunn respond for his client, Mr. Gugino. My clients are the actual clients of Mr. Gugino in that case. And that further obviates the issue for my clients. They took no affirmative act whatsoever and made no requests. Well, I think you're liable or your client because Mr. Gugino is your agent. I understand why we're here, and Judge Jones made that eminently clear to me at the last hearing. So thank you for your indulgence. Good morning. May it please the Court, I'm Jan Cook, and I represent Freddie Joe Burton and myself. I think when you do appellate law, there's two ways to do it, obfuscate or clarify. Why don't you clarify for me what damages you suffered? Attorney's fees and an attempt to stay out of contempt of court. I simply ñ I gave Mr. Gugino numerous communications and correspondences saying, look, here's the law, Section 362, we don't need to do this. Mr. Baker said so at the hearing that the interpleader was defective, that we should do it in bankruptcy court. Mr. Gugino himself said to Judge Israel, we're probably deemed as creditors, which means we're probably going to receive notices soon. But he complained that they weren't going to get as much money, there were expenses to go to the bankruptcy court, et cetera. The problem, though, is that it's often the case when a bankruptcy is filed during the pendency of other proceedings, that a court will have a status conference to try to figure out to what extent the bankruptcy applies. It can be an issue of whether or not the material at issue is property of the estate, et cetera, et cetera. So the fact that somebody orders a status conference is really not a particularly surprising event in bankruptcy law, the way it interacts with state or federal law. Well, I understand that, and I attended those conferences. I wasn't a party to the interpleader. I had no real notice. I wasn't summoned. I had a phone call, and I attend. But once somebody says and taunts me and tells me I'm going to be held in contempt of court, I become a little more leery of attending, which is when I said, I'm not in contempt of court. You'll be in contempt of court. I'm giving the money to the trustee. Why didn't you show up on the June 6, 2011, status conference that Judge Israel had? If you had shown up, wouldn't that have straightened everything out right then and there? Because at that point, I felt threatened with the contempt citation, and I didn't have representation. All this was happening fairly quickly. And like I said, just with a phone call, will you attend this? And I did attend. But you didn't attend June 6. No, I did not. I wasn't summoned. I had no process that told me to come, and I wasn't a party to the litigation. So I didn't see how I could be held in contempt of court. But if you're compelling me to attend something and I'm not a party to it and I have no process, then it seems to me you might actually think I'm in contempt of court. You wouldn't have been in contempt for showing up at a status conference that you had noticed to attend. He said at that particular date, if I didn't have that money tendered to the court, turned over to the court, I would be in contempt. And he had made that ruling, I believe it was in a minute order, prior to that hearing. And I couldn't give that money over because I'd given it to the trustee. And that money had been deposited with the trustee at that point in time. So you were just concerned about the personal risk rather than informing the court about what was going on in the bankruptcy court. I'm sorry. You were just concerned with your personal risk and not actually informing the State court what was going on in the Federal bankruptcy court. I mean, it looks to me, if you look at it, if you look at it reading between the lines, they're trying to figure out whether this money is property of the estate or not. If it's not property of the estate, the bankruptcy court doesn't have jurisdiction over it. The fact you turned it over, you know, that's, I think, is, were there any documents you submitted other than your word that you turned it over to the bankruptcy court? Yes, I gave them proof. I gave them the copy of the check. I gave them the copy of the trustee's. It's in the record. I gave them a copy of the trustee's letter to me. I gave them a copy of Mr. Attorney Crosby's filing of the bankruptcy off the PACER, I believe it is, the bankruptcy off that program. And I took all of that to the first hearing. What was the date of the first hearing? I'm sorry? What was the date of the first hearing? The first hearing was June, if I recall, it was June 6th. All right. Now, if you had shown up on June 6th, but no, that's the one you didn't attend. No, I believe the one that I did. June 6th was the first one, and I showed up and gave those documents and told them of that information, and that's when, if I'm not mistaken, Mr. Gugino said we're going to receive notices soon. The July 11th one, in my recollection, was the one I did not attend. But the money had been given to the trustee. They knew that. Well, wait. March 28th, 2011, was when Judge Israel held a status check hearing on the state interpleader action. You attended that hearing on March 28th. Okay, but I'm off by one hearing. Yeah, June 6th was the one you didn't attend. Okay, I'm sorry. Do you really think Judge Israel was going to haul you off to jail on June 6th if you had shown up? But they were given the documents that I told you about at the March hearing, and I did not have the money. The trustee had the money. So it was almost, in my view, futile. What could I do? They knew, and I told them I had to give the money to the trustee. You could have explained that to Judge Israel on June 6th. Because I'd already done it in March, if I'm not mistaken. It appears that Judge Israel was of the mind that the interpleader action should proceed, and that was the appropriate way to dispose of the funds, as opposed to through bankruptcy. Except then Freddie Joe Burton would have been exposed to excess liability. Michelle doesn't address that. Michelle was not a case where there was a bankrupt involved. In Michelle, there was a dispute over liens, and that was the proper way to dispose of that. Mr. Burton would have had excess liability and would have had to file the bankruptcy in any event. So you notified the court of the existence of the bankruptcy to stay in? Originally, that interpleader was filed because we were attempting to comply with Michelle, but Ms. Alf didn't file it timely. She said, give me six weeks, we'll get it filed, we'll get it resolved, and Mr. Burton can go file his bankruptcy. I said, fine. About six, seven, eight months later, Mr. Burton says, I'm getting notices, what about the bankruptcy? And I found out that Mr. Crosby had misfiled the fee under a different client and thought that Mr. Burton hadn't paid him. But when finally the interpleader was filed by Ms. Alf and then taken over by Mr. Guguino, Mr. Crosby had already filed the bankruptcy about a year late. But I'm just saying, was the State court, was Judge Israel aware that there was a stay in place? Was he aware? Did you make him aware of that? Yes. Because I took that filing off of PACER. It had occurred about a week before by Mr. Crosby, and I showed it to Judge Israel. And it should be in the record. It should be in the exhibits to the original complaint. And as I say, I had given the trustee the money, so I didn't know how I could be threatened with anything. And I did think it was preposterous, but I told them I was giving the money to the trustee, and I had proven that with the check, a copy of the letter, a copy of my letter. It should be in the exhibits with the original complaint. So what's the status of the bankruptcy now? Discharge. And was it Chapter 7 or was it Chapter 11? It was 7. And I would say this, that Judge Israel takes a lot more caution when he has a case in open court and there's a bankruptcy filed. He makes very clear on the record what he's going to do and not do, and it certainly doesn't have ñ he never mentions Michelle, and he never tells somebody they might be in contempt. Are you talking about Judge Israel now? Yes, I am. He goes to great lengths now when there's a bankruptcy filed. Now you're talking about something that's outside the record. Yes. Okay. Thank you. Yes, thank you. We'll give you two minutes. Thank you, Your Honor. I want to address Judge Geilman's question that he gave to Mr. McNutt. As far as communication, if you look closely at the record, look at the way Eugenio communicated. He conveyed ñ he prepared that draft order the same day. He immediately that day provided a copy to counsel, including Mr. Cook. So Mr. Cook could do something about it. Mr. Cook fired off some angry faxes. Eugenio sent his letter. And if you look at the record, the letter dated June 9th from Mr. Eugenio. He reaches out the Olive Branch. He said if he had called me, we could have dealt with this. I didn't ask for this. I didn't want this. You know, that's sort of contrary to what ñ I mean, I've just been rereading the transcript. And your client goes in there and says, a letter I sent to all the parties. And the court says, well, I ordered him to put the funds in here. And then both your ñ you know, Mr. Baker and your client says he didn't, he didn't. And then your client says, that's why I'm reporting this to you. This is really important. And that letter that Mr. Eugenio is referring to, as soon as the bankruptcy was filed, Eugenio stopped. He did what he should under 362. He was working with the bankruptcy trustee to try to resolve this issue. If you look at the transcripts closely, Judge Israel got hung up. No, no, but then it goes on. He says, okay, then I'm going to issue a shorter cause. And then it goes on and he said, who wants to draft the order? And your client goes, me. I'll draft it. It wasn't, you know, this notion of the knife out there and people being compelled. I mean, your client raised his hand and said, I'll do the order. And that's why they called the status conference and said he hasn't deposited the money. So, I mean, reading it fairly, it's ñ you were trying to collect the dough at that point, which had violated the automatic stay. I don't think the record shows that at all. The transcripts show Eugenio came up with this all on his own. Eugenio ñ Israel came up with this all on his own. Eugenio never asked for it. As far as volunteering for the order, Judge Israel asked, who wants to prepare the order? Eugenio asked, what date? Israel, Mr. Eugenio, I'll prepare the order, Your Honor. If it wasn't Eugenio, it would be another attorney. He didn't have to say that. He didn't have to say that. He didn't have to say, I'll do it. He didn't, but it puts attorneys in a difficult position when they appear before judges, they appear before regularly, to be non-cooperative with the court. To put an attorney in a position where on the fly they have to determine if what the judge is asking for is going to expose them to a Federal lawsuit, that's tough for an attorney to say, Your Honor, sorry, hands off, I'm not touching this. Well, it wasn't like that. I mean, if neither party said anything, then the judge may have said, okay, since neither one of you is volunteering, you do it. But it didn't get to that because Mr. Eugenio volunteered before it ever got to the point where the judge directed one or the other to do it. No, I think the appropriate thing to do is understand, Burke, is to say, you know, Your Honor, I think we have to take a step back here because there's an automatic stay that's been issued by a Federal bankruptcy court and or to draft an order that says a status conference in light of it. I mean, that's the important thing about immunity is we're not here disputing whether mistakes were made, whether people would do things differently in hindsight. Immunity protects the judicial process, and that includes all of the actors who were involved in that judicial process. That's not true. That's not what our cases say. It doesn't say all of the actors. Immunity is limited by our case law right now. If we rule the way you want us to rule, we are extending the concept of immunity beyond those who have traditionally been protected. The case law says that core judicial functions are protected by immunity. This is as core of a judicial function as there is. So I think that reversal in this case is actually following the established immunity case law. It's not making an extension because the case law does not look at the actor performing. It looks at the function that's being performed consistently. Reversal is the more straightforward path here. The difficulty I'm having with your argument is that then that would immunize attorneys for anything they put in orders at the vague instruction of a judge, and I don't see where there's a stopping point. The stopping point in this case, the unique thing about this case is that Eugenio never asked for this. Unlike Sternberg where the attorney was aggressively pursuing it, all Eugenio did was be cooperative with the judge, and he immediately provided a copy of that to counsel so he could address it. To the communication point in something that was discussed during Koch's rebuttal, if Mr. Koch had simply appeared at the hearing or filed something quickly or sent a letter to the judge explaining why what the judge was doing sui sponte was in violation of 362K, we wouldn't be here. This did not require a federal lawsuit. Here if your client had done the same thing. If your client had done the exact same thing you're saying that Mr. Koch should have done, we wouldn't be here. Mr. Koch was not a party. In hindsight, everybody would do things differently this time around. But all Eugenio did in this case was comply with the judge's request that one of the attorneys prepare the order. I think my time is up. So thank you. Thank you. The case has now been submitted for decision.
judges: Thomas, Gilman, Rawlinson